**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KEVIN STEVENS, DANIEL LORANCA, SARAH BUCHANAN, TIMOTHY BLAIR, and JOSEPH DESTEFANO, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BBC GLOBAL NEWS US, LLC, <br><br> Defendant. | **Case No.  26-cv-03635** <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs, Kevin Stevens, Daniel Loranca, Sarah Buchanan, Timothy Blair, and Joseph DeStefano ("Plaintiffs"), individually and on behalf of all others similarly situated, assert the following against Defendant BBC Global News US, LLC ("Defendant") based on personal knowledge, and where applicable information and belief, and the investigation of counsel.

## I.    INTRODUCTION

1.    Defendant BBC Global News US, LLC ("BBC") is one of the largest news and media organizations in the world. BBC operates a website located at www.bbc.com (the "Website"), which provides visitors with access to online articles, photos, prerecorded videos, and multimedia content covering global news, current affairs, entertainment, and other informational programming. It also publishes a newsletter that similarly provides subscribers with articles, prerecorded videos, and multimedia content (the "Newsletter"). The Newsletter contains links to, and redirects recipients to, the Website. The Website offers users the option to subscribe by providing an email address or by paying a monthly or annual fee. Subscribers gain access to additional content from the Website and Defendant, including prerecorded video materials.

2.      The Website offers subscribers access to a wide array of prerecorded video content including news clips, documentaries, full episodes of BBC shows, and multimedia segments concerning global news, politics, business, culture, and entertainment. Millions of individuals subscribe to the Website to view prerecorded video content each year, including Plaintiffs.

3.      Unbeknownst to Website users, BBC disclosed individuals' private video viewing history with personally identifiable information in the form of email addresses and unique identifiers to third-party analytics and tracking entities through tracking technology embedded in the Website. These tracking entities—which include, at least, Piano Analytics ("Piano")—are designed to aggregate user data across websites implementing their technology into profiles that identify particular persons for advertisers and analytics purposes.

4.      To accomplish this, analytics and tracking entities, including Piano Analytics, collect directly identifiable personal information, such as an individual's email address, and map it to an analytics profile. Each time an individual uses a connected website, like the BBC Website, the tracking entity's technology queries a centralized analytics service that finds the profile associated with that specific individual and incorporates information about that person's web activity, including the URLs of webpages visited, the titles and descriptions of videos watched, and actions taken on the Website. This data is used to power targeted advertising and analytics, and it is available to any marketer or advertiser who accesses Piano's analytics platform.

5.      The video viewing history the Website transmits to these tracking entities is individually identifiable for at least two separate reasons. First, the Website shares highly personal information reflecting users' video viewing history alongside information that identifies a specific person on *its face*, such as the individual's unencrypted email address and approximate geographic location.

6. Second, while not necessary to identify users because video viewing history is transmitted with information that is directly identifiable, the Website also transmits all video viewing histories with persistent unique identifiers—including unique cross-platform tracking codes generated by Piano Analytics. Using either the individual's email address or the persistent unique identifiers, Piano Analytics then joins that individual's video viewing history with the specific analytics profile for that Website user. As a result, Website users' video viewing histories are not only mapped to Piano Analytics' individual user profiles as described herein, but are also available to marketers who query Piano Analytics' user profiles.

7. This conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* (the "VPPA"), which prohibits BBC from disclosing identifiable video viewing history information about Plaintiffs and other Class members. BBC knew its conduct violated this statute because: (1) it programmed the Website specifically to transmit subscribers' personally identifiable information ("PII") (including PII identifiable on its face, like email addresses) alongside video viewing history to tracking entities, including Piano Analytics, and (2) it did so without obtaining consent from Plaintiffs or Class members in the form required by the statute.

8. Given the ongoing, surreptitious nature of BBC's transmission of identifiable video viewing history, Plaintiffs are confident additional information demonstrating the violation will be revealed in discovery, including the personally identifiable profiles BBC's tracking entities maintain about them.

## II. PARTIES

### A. Plaintiffs

#### 1. Kevin Stevens

9. Plaintiff Kevin Stevens is, and has been at all relevant times, a citizen and resident of Buffalo, New York.

10.     Plaintiff Stevens has been a subscriber to the Website since approximately 2021 and maintains a subscription to the Website through at least the filing of this Complaint. Plaintiff Stevens's Website subscription provides access to audiovisual content provided by Defendant, including prerecorded video materials.

11.     Plaintiff Stevens has also been a subscriber to the Newsletter published by Defendant since approximately 2021 and maintains a subscription to the Newsletter through at least the filing of this Complaint. Plaintiff Stevens's Newsletter subscription provides him with a weekly newsletter sent to his email address, which includes audiovisual content and links to audiovisual content on the Website, including prerecorded video materials. Plaintiff Stevens provided, at least, his email address to Defendant in connection with subscribing to the Website and the Newsletter.

12.     Plaintiff Stevens accessed the Website and the Newsletter on his personal devices to view prerecorded video content available to subscribers. During these periods, Plaintiff Stevens was the only person with access to his devices.

13.     Unbeknownst to Plaintiff Stevens, Defendant disclosed, at least, the titles and URLs of prerecorded videos he viewed on the Website to tracking entities alongside personally identifiable information, as described herein.

14.     For instance, when Plaintiff Stevens used the Website, Defendant transmitted, at least, Plaintiff Stevens's email address with video viewing data and persistent identifiers to Piano Analytics.

15.     In addition to being directly identifiable on its face, Piano Analytics joined Plaintiff Stevens's email address, as well as his video viewing history, to his Piano Analytics profile. This profile incorporated all data Piano Analytics received from the Website.

4

16.     Plaintiff Stevens's activity (including his video viewing history) on the Website, as a result, was directly identifiable to at least Piano, and to any marketer who accessed his Piano Analytics profile. Defendant disclosed personally identifiable information which was directly identifiable, and allowed Piano Analytics, or any other ordinary recipient to identify Plaintiff Stevens, with little or no extra effort, as the unique individual using the Website to view these videos.

17.     Plaintiff Stevens's identifiable video viewing data on the Website was consolidated and stored in a unique user profile by Piano Analytics precisely to facilitate targeted advertising and analytics.

18.     Plaintiff Stevens did not consent to Defendant's disclosure of his video viewing history to Piano, or any other third party, which could identify him and associate this video viewing history with his specific identity profile as described herein.

### 2.     Daniel Loranca

19.     Plaintiff Daniel Loranca is, and has been at all relevant times, a citizen and resident of New York.

20.     Plaintiff Loranca has been a subscriber to the Website since approximately January 2023 and maintains a subscription to the Website through at least the filing of this Complaint. Plaintiff Loranca's Website subscription provides access to audiovisual content provided by Defendant, including prerecorded video materials.

21.     Plaintiff Loranca was also a subscriber to the Newsletter published by Defendant from approximately January 2020 through April 2026. Plaintiff Loranca's Newsletter subscription provided him with a weekly newsletter sent to his email address, which included audiovisual content and links to audiovisual content on the Website, including prerecorded video materials.

Plaintiff Loranca provided, at least, his email address to Defendant in connection with subscribing to the Website and the Newsletter.

22.    Plaintiff Loranca accessed the Website and the Newsletter on his personal devices to view prerecorded video content available to subscribers. During these periods, Plaintiff Loranca was the only person with access to his devices.

23.    Unbeknownst to Plaintiff Loranca, Defendant disclosed, at least, the titles and URLs of prerecorded videos he viewed on the Website to tracking entities alongside personally identifiable information, as described herein.

24.    For instance, when Plaintiff Loranca used the Website, Defendant transmitted, at least, Plaintiff Loranca's email address with video viewing data and persistent identifiers to Piano.

25.    In addition to being directly identifiable on its face, Piano joined Plaintiff Loranca's email address, as well as his video viewing history, to his Piano Analytics profile. This profile incorporated all data Piano Analytics received from the Website.

26.    Plaintiff Loranca's activity (including his video viewing history) on the Website, as a result, was directly identifiable to at least Piano, and to any marketer who accessed his Piano Analytics profile. Defendant disclosed personally identifiable information which was directly identifiable, and allowed Piano, or any other ordinary recipient to identify Plaintiff Loranca, with little or no extra effort, as the unique individual using the Website to view these videos.

27.    Plaintiff Loranca's identifiable video viewing data on the Website was consolidated and stored in a unique user profile by Piano precisely to facilitate targeted advertising and analytics.

28.     Plaintiff Loranca did not consent to Defendant's disclosure of his video viewing history to Piano, or any other third party, which could identify him and associate this video viewing history with his specific identity profile as described herein.

### 3.     Sarah Buchanan

29.     Plaintiff Sarah Buchanan is, and has been at all relevant times, a citizen and resident of Mercer County, West Virginia.

30.     Plaintiff Buchanan has been a subscriber to the Website since approximately 2023 and maintains a subscription to the Website through at least the filing of this Complaint. Plaintiff Buchanan's Website subscription provides access to audiovisual content provided by Defendant, including prerecorded video materials.

31.     Plaintiff Buchanan has also been a subscriber to the Newsletter published by Defendant since approximately 2023 and maintains a subscription to the Newsletter through at least the filing of this Complaint. Plaintiff Buchanan's Newsletter subscription provides her with a weekly newsletter sent to her email address, which includes audiovisual content and links to audiovisual content on the Website, including prerecorded video materials. Plaintiff Buchanan provided, at least, her email address to Defendant in connection with subscribing to the Website and the Newsletter.

32.     Plaintiff Buchanan accessed the Website and the Newsletter on her personal devices to view prerecorded video content available to subscribers. During these periods, Plaintiff Buchanan was the only person with access to her devices.

33.     Unbeknownst to Plaintiff Buchanan, Defendant disclosed, at least, the titles and URLs of prerecorded videos she viewed on the Website to tracking entities alongside personally identifiable information, as described herein.

34.     For instance, when Plaintiff Buchanan used the Website, Defendant transmitted, at least, Plaintiff Buchanan's email address with video viewing data and persistent identifiers to Piano Analytics.

35.     In addition to being directly identifiable on its face, Piano Analytics joined Plaintiff Buchanan's email address, as well as her video viewing history, to her Piano Analytics profile. This profile incorporated all data Piano Analytics received from the Website.

36.     Plaintiff Buchanan's activity (including her video viewing history) on the Website, as a result, was directly identifiable to at least Piano, and to any marketer who accessed her Piano Analytics profile. Defendant disclosed personally identifiable information which was directly identifiable, and allowed Piano Analytics, or any other ordinary recipient to identify Plaintiff Buchanan, with little or no extra effort, as the unique individual using the Website to view these videos.

37.     Plaintiff Buchanan's identifiable video viewing data on the Website was consolidated and stored in a unique user profile by Piano Analytics precisely to facilitate targeted advertising and analytics.

38.     Plaintiff Buchanan did not consent to Defendant's disclosure of her video viewing history to Piano, or any other third party, which could identify her and associate this video viewing history with her specific identity profile as described herein.

### 4.     Timothy Blair

39.     Plaintiff Timothy Blair is, and has been at all relevant times, a citizen and resident of Los Angeles County, California.

40.     Plaintiff Blair has been a subscriber to the Website since at least approximately 2016 and a paid subscriber to the Website since approximately February 2026 and maintains a subscription to the Website through at least the filing of this Complaint. Plaintiff Blair's Website

subscription provides access to audiovisual content provided by Defendant, including prerecorded video materials. Plaintiff Blair provided, at least, his email address to Defendant in connection with subscribing to the Website.

41. Plaintiff Blair accessed the Website on his personal devices to view prerecorded video content available to subscribers. During these periods, Plaintiff Blair was the only person with access to his devices.

42. Unbeknownst to Plaintiff Blair, Defendant disclosed, at least, the titles and URLs of prerecorded videos he viewed on the Website to tracking entities alongside personally identifiable information, as described herein.

43. For instance, when Plaintiff Blair used the Website, Defendant transmitted, at least, Plaintiff Blair's email address with video viewing data and persistent identifiers to Piano Analytics.

44. In addition to being directly identifiable on its face, Piano Analytics joined Plaintiff Blair's email address, as well as his video viewing history, to his Piano Analytics profile. This profile incorporated all data Piano Analytics received from the Website.

45. Plaintiff Blair's activity (including his video viewing history) on the Website, as a result, was directly identifiable to at least Piano, and to any marketer who accessed his Piano Analytics profile. Defendant disclosed personally identifiable information which was directly identifiable, and allowed Piano Analytics, or any other ordinary recipient to identify Plaintiff Blair, with little or no extra effort, as the unique individual using the Website to view these videos.

46. Plaintiff Blair's identifiable video viewing data on the Website was consolidated and stored in a unique user profile by Piano Analytics precisely to facilitate targeted advertising and analytics.

47. Plaintiff Blair did not consent to Defendant's disclosure of his video viewing history to Piano, or any other third party, which could identify him and associate this video viewing history with his specific identity profile as described herein.

### 5. Joseph DeStefano

48. Plaintiff Joseph DeStefano is, and has been at all relevant times, a citizen and resident of Suffolk, Virginia.

49. Plaintiff DeStefano has been a subscriber to the Website since approximately 2016 and maintains a subscription to the Website through at least the filing of this Complaint. Plaintiff DeStefano's Website subscription provides access to audiovisual content provided by Defendant, including prerecorded video materials.

50. Plaintiff DeStefano has also been a subscriber to the Newsletter published by Defendant since approximately 2016 and maintains a subscription to the Newsletter through at least the filing of this Complaint. Plaintiff DeStefano's Newsletter subscription provides him with a weekly newsletter sent to his email address, which includes audiovisual content and links to audiovisual content on the Website, including prerecorded video materials. Plaintiff DeStefano provided, at least, his email address to Defendant in connection with subscribing to the Website and the Newsletter.

51. Plaintiff DeStefano accessed the Website and the Newsletter on his personal devices to view prerecorded video content available to subscribers. During these periods, Plaintiff DeStefano was the only person with access to his devices.

52. Unbeknownst to Plaintiff DeStefano, Defendant disclosed, at least, the titles and URLs of prerecorded videos he viewed on the Website to tracking entities alongside personally identifiable information, as described herein.

53.    For instance, when Plaintiff DeStefano used the Website, Defendant transmitted, at least, Plaintiff DeStefano's email address with video viewing data and persistent identifiers to Piano Analytics.

54.    In addition to being directly identifiable on its face, Piano Analytics joined Plaintiff DeStefano's email address, as well as his video viewing history, to his Piano Analytics profile. This profile incorporated all data Piano Analytics received from the Website.

55.    Plaintiff DeStefano's activity (including his video viewing history) on the Website, as a result, was directly identifiable to at least Piano, and to any marketer who accessed his Piano Analytics profile. Defendant disclosed personally identifiable information which was directly identifiable, and allowed Piano Analytics, or any other ordinary recipient to identify Plaintiff DeStefano, with little or no extra effort, as the unique individual using the Website to view these videos.

56.    Plaintiff DeStefano's identifiable video viewing data on the Website was consolidated and stored in a unique user profile by Piano Analytics precisely to facilitate targeted advertising and analytics.

57.    Plaintiff DeStefano did not consent to Defendant's disclosure of his video viewing history to Piano, or any other third party, which could identify him and associate this video viewing history with his specific identity profile as described herein.

**B.    Defendant**

58.    Defendant BBC Global News US, LLC is a limited liability company organized and existing under the laws of the State of New York. Its principal mailing address is 1120 Avenue of the Americas, 5th Floor, New York, NY 10036. BBC Global News US, LLC conducts business in New York and throughout the United States, including by operating, publishing, and distributing digital news and media content through the Website and related online platforms.

11

## III. JURISDICTION AND VENUE

59.    This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs' claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class members; (2) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in different states.

60.    This Court has general personal jurisdiction over Defendant because Defendant is organized under the laws of the State of New York and maintains its principal place of business in New York. Defendant is also subject to specific personal jurisdiction in this State because it maintains sufficient minimum contacts with the State of New York and a substantial part of the events and conduct giving rise to Plaintiffs' and Class members' claims occurred in this state.

61.    Further, BBC's Terms of Service contain a choice-of-law provision requiring that disputes be governed by the laws of New York.

62.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant's principal place of business is located in this District, and because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## IV. FACTUAL ALLEGATIONS

### A. Background of the VPPA

63.    The VPPA generally prohibits the knowing disclosure of information that identifies a consumer as having requested or obtained specific video materials or services. 18 U.S.C. § 2710(b)(1).

12

64.     Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00 per violation), punitive damages, equitable relief, reasonable attorneys' fees, and other reasonably incurred litigation costs. *Id.* § 2710(c)(2).

65.     The VPPA was initially passed in 1988 to protect the privacy of individuals' and their families' video rental, purchase, and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

66.     Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes[,]" such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id*. at 7-8.

67.     In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information and the need to protect it from disclosure inspired the statute: "These activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

68.    These statements rang true in 1988 when Congress passed the VPPA, and even more so today in the modern era of data mining and online video content in which most Americans partake. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

### B.    The Evolution of Person-Level Identity Solutions

69.    Digital advertising has undergone a shift in recent years from device-centric targeting to personal-level identity solutions built to identify specific individuals. Unlike earlier iterations that relied on device-level identifiers and thus treated each browser or phone as a separate "anonymous" user, modern identity solutions recognize the ***same individual*** across multiple devices and touchpoints (*i.e.*, where they interact with identity service providers).

70.    Personal-level identity solutions developed over the last several years in direct response to changes made by technology companies intended to limit third party tracking in response to consumer privacy concerns. This started at least as early as 2018 when Apple and Mozilla, developers of the Safari and Firefox web browsers, respectively, began blocking third party cookies by default.

71.    Third-party cookies are small text files placed on a user's device by domains other than the one they are visiting, such as those run by advertisers who had deployed their tracking

---

[1] *See* Statement of the Honorable Patrick Leahy, United States Senator, January 31, 2012, https://www.judiciary.senate.gov/imo/media/doc/leahy_statement_01_31_12.pdf (last visited May 1, 2026).

technology on a given webpage. These cookies provide third party advertisers with a powerful tool to track device-level activity by embedding identifying information on devices that could be retrieved as a user visited different sites around the internet. For instance, a visitor to The New York Times' website would receive a third party cookie from Google, DoubleClick, or other advertiser domains, that would remain on their device and allowed browsing activity *after* leaving The New York Times to be associated with the same person. Because certain browsers began blocking the ability for advertisers to deploy third party cookies, companies sought out a different tracking solution.

72.    Around the same time, major smartphone operating systems began allowing users to opt out of device-level tracking. Tracking at the device level on smartphones had traditionally relied on device-level identifiers, like Apple's Identifier for Advertisers ("IDFA") and Identifier for Vendors ("IDFV"), or Android's Advertising ID ("AAID"). These persistent device identifiers are recognized as personal information under various laws, including the California Consumer Privacy Act of 2018 ("CCPA"). With the release of iOS 14 in 2020, Apple allowed users to "Ask App[s] Not to Track" their activity when first launched. Advertisers were so concerned with this feature that Meta (the parent company of advertising gold mines Facebook and Instagram) publicly campaigned against it, taking out full page newspaper ads ostensibly on behalf of small businesses that would be harmed if their ability to target customers with ads (on Meta's ad platform of course) was reduced. Android adopted a similar feature shortly after Apple's iOS update, which gave nearly all users in the United States the option to opt out of this form of app tracking.

73.    Rather than respect users' privacy choices or follow the clear public trend developing against online tracking, several companies instead developed identity solutions to fill the gap left by third party cookies and device identifiers with new tracking techniques. But these

15

second-generation identity solutions were not just a replacement for the device-level tracking being left behind, they were a major improvement that capitalized on advancements in data science, artificial intelligence, and the sheer volume of information about individuals' web and app activity collected in the years since the initial wave of privacy-centric changes to browsers and app tracking took place.

74.    Although there are slight differences among them, modern identity services overcame the limitations of device-level identifiers by adopting a hybrid approach that merged *deterministic data*—such as email addresses, phone numbers, customer IDs, and user login names—with *probabilistic data*—such as device fingerprints,[2] browsing behavior patterns, location history, and IP addresses to develop comprehensive identity profiles of individual people, rather than devices.

75.    This enhanced process works as follows: identity service providers collect deterministic data from apps and websites—like the Website—that integrate their services when users create an account, log in to an account, make a purchase, or take some other personally identifiable action. For example, the Website transmitted the user's email address and at least one other unique identifier to Piano Analytics at login. The Website also transmitted users' email addresses with video viewing information. Deterministic data identifies an individual by default because it is tied to directly identifiable data, such as a user's email address, their exact location (e.g., their billing address, shipping address, or GPS location), or phone number. This deterministic data anchors the identity service provider's profile about that specific person.

---

[2] Device fingerprinting is a probabilistic data technique that allows advertisers to identify a unique device based on its specific collection of using seemingly innocuous attributes—like the browser it is running, which fonts it has installed, the OS version, etc.—in the absence of a device-level identifier such as an IDFA or AAID.

76.     Identity service providers compile and use this deterministic data to track users across devices and match data to a single individual. This eliminates the issue created by older techniques whereby a user who engaged with a website on multiple devices (*e.g.*, a phone, desktop computer, tablet) would be treated as multiple separate users. The current practice of cross-device tracking combines deterministic and probabilistic approaches, where needed, to create a unified identity for each person. For instance, if a user logs in to a website on their laptop with their email address, which is often required to create an account, and the same email address is used in an app on their phone, the identity service provider will tie these two devices to the person with that email address by mapping that email to a unique, cross-platform identifier created by the service provider. If there is no unique login present, *probabilistic data* can still be used to link the associated data to the same user's profile based on device fingerprinting, browsing history, and activity patterns at a specific location or IP address.

77.     This hybrid data model and practice of using cross-device identifiers to track users across websites and apps has dramatically improved the accuracy of identity resolution when compared to the standalone use of device-identifiers (like IDFA or AAID). Moreover, it *completely circumvents* an individual's ability to opt out of tracking. Unlike cookies, which could be cleared or deleted by users, or device identifiers, that users could opt out of, the cross-platform identifiers assigned by identity solution providers—like the Piano Analytics identifier—cannot be avoided or opted out of, making them persistent, pervasive, and extremely powerful.

78.     The sections below describe how the specific identity solutions that Defendant integrated into the Website deploy the same techniques to stitch together a unified identity profile for each *individual* Website user. The resulting personalized identity profiles are then used to power person-level targeted advertising and tracking across devices, platforms, and apps.

17

79.     The data sent to Piano Analytics from the Website is personally identifiable on its face, regardless of Piano Analytics' capabilities. However, Piano Analytics and other identity service providers' ability to associate user data with specific individual user profiles further illustrates the grave harm to privacy, that results from Defendant's unauthorized disclosure of video viewing history to third parties, along with its offensive and deceptive nature.

C.     **Tracking Deployed on the Website**

1.     **Background of Piano Analytics**

80.     Piano is a digital revenue optimization company, whose products are aimed at improving digital interactions between companies and their customers.

81.     One of the tools offered by Piano is Analytics Data Collection ("Piano Analytics"), which Piano recommends be powered by its Piano Analytics SDK.[3] Piano Analytics tracks events and other actions taken by a visitor on the Website.

82.     Data for Piano Analytics can be gathered in one of two ways: (1) it can be gathered client-side, meaning that the data is sent from the browser of a visitor of the site directly to Piano, or (2) it can be gathered server-side, meaning that the data is sent from Defendant's server directly to Piano.[4]

83.     When the data is sent client-side, a website visitor's browser sends an HTTP POST request to Piano.[5]

---

[3] *Piano Analytics Data Collection,* https://analytics-docs.piano.io/en/analytics/v1/piano-analytics-data-collection (last visited May 1, 2026).
[4] *Id*.
[5] *Id*.



84.     POST requests can be used by browsers to send data to a server. POST requests associated with Piano contain information about the actions of the visitor, such as the URL of the page they visited, as well as data about the visitor themselves, such as their email address or location.

85.     As Piano itself notes, however, client-side collections can be "disturbed" by visitors' use of certain browsers or browser plugins.[6] As a result, Piano Analytics also provides for server-side collections:[7]



86.     As Piano plainly notes, implementations where the analytics data originates from a server are "not visible by the visitor."[8]

_____

[6] *Id.*
[7] *Id.*
[8] *Id.*

87.    The information surreptitiously disclosed via Piano Analytics is then integrated into subscriber profiles and made available in the Piano Data Collection Portal, and it provides Defendant with a better understanding of who its customers are and how they navigate around the Website. Defendant has intentionally implemented Piano Analytics on the Website, sending visitors' personally identifiable information to Piano without their consent.

88.    When a free newsletter subscriber or Website subscriber shares their email address with the BBC at either sign-up or subscription conversion, unbeknownst to that person, third-party Piano receives their unhashed email address. On information and belief, this occurs via server-to-server transmissions between the BBC and Piano on the back end. This is because after a user has given their email address to the BBC Website via a sign-up or account conversion, any subsequent request from the BBC browser to Piano's servers results in responses from Piano containing the user's plain-text, unhashed email address, easily readable by an ordinary person: [9]

---

[9] Email addresses are redacted to maintain privacy.



89.     In violation of the VPPA, the BBC again transmits any given subscriber's email address to Piano, along with that individual's video viewing information (including video titles and description), each time the individual watches audiovisual content on the BBC Website. In the example below, the user is requesting or obtaining Defendant's video entitled *Watch as Andrew Mountbatten-Windsor's car leaves police station*:

22



90.     Piano Analytics causes a subscriber's browser to send the subscriber's email address, the URL of the webpage that a subscriber is viewing, as well as the title, URL, and description of the video, along with an assigned unique ID, and approximate geographic location ("us-ca" for a California-based user, also visible in the screenshot above):[10]



91.    Using the data that is sent to Piano, which is visible and understandable to an ordinary visitor, any person can determine the identity of a Website visitor and the actions, including which webpages visitors visited and which videos were requested and watched, along with actions taken by the visitor on the Website.

92.    Piano Analytics' tracking is persistent and continuous. As long as Defendant keeps Piano Analytics integrated in its Website, Piano continues to collect data about users' behavior and stores it in the user's analytics profile.

**D.    Website Subscribers Did Not Consent to Disclosure**

93.    Plaintiffs and Class members did not consent to BBC's disclosure of their video viewing history and personally identifiable information.

94.    The VPPA requires Defendant to obtain informed, written consent from subscribers before disclosing their video viewing history and personally identifiable information with third parties.

95.    As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be: (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. The Website does not provide any separate written consent form at the time of sign up, or otherwise in a form that meets the requirements set forth in the VPPA.

96.    Defendant did not comply with the VPPA by failing to obtain the informed, written consent of Plaintiffs and the Class to share their identifiable video viewing history and personally identifiable information with third parties, including the identity service providers described herein.

97.    Therefore, Defendant failed to obtain informed, written consent in compliance with VPPA.

**E.    Plaintiffs and Class Members Were Harmed by BBC's Privacy Violations**

98.    Defendant's conduct violates Plaintiffs' and Class members' privacy rights and deprives them of control over their personal information and inflicted exactly the type of harm on Plaintiffs and Class members that the VPPA was designed to prevent.

99.    In this case, Defendant violated Plaintiffs' and Class members' privacy rights by purposely disclosing their video viewing activity and personally identifiable information to third parties, including identity service providers whose entire purpose is to use that data to identify specific individuals. Plaintiffs and Class members reasonably expected their viewing histories, preferences, personally identifiable information, and identities would be kept private.

100.    The personal information Defendant obtained from Plaintiffs and Class members is valuable data in the digital advertising-related market for consumer information.

101.    Because BBC places advertisements alongside its prerecorded video content and embeds commercials within its video content, BBC is incentivized to enhance the "targeting" of such ads, allowing companies that pay BBC to advertise to reach their "ideal" audience.

102.    BBC benefits at Plaintiffs' and Class members' expense, where Plaintiffs and Class members never consented to BBC's disclosure of their personally identifiable information.

**V.    CLASS ACTION ALLEGATIONS**

103.    Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and/or (b)(3), and/or (c)(4) as representatives of the following class:

> All persons in the United States who subscribed to the BBC Website, requested or obtained prerecorded video materials or services on the BBC Website via a browser, and whose personally identifiable information was improperly disclosed to Piano or other third parties.

104.    Excluded from the Class are (1) any Judge or Magistrate presiding over this action and any members of their immediate families; (2) Defendant, Defendant's subsidiaries, affiliates,

parents, successors, predecessors, and any entity in which BBC or its parents have a controlling interest and its current or former employees, officers, and directors; and (3) Plaintiffs' counsel and Defendant's counsel.

105.    Plaintiffs reserve the right to modify, change, or expand the Class definition based upon discovery and further investigation.

106.    **Numerosity**: The Class consists of at least hundreds of individuals, making joinder impractical.

107.    **Commonality and Predominance**: Common questions of law and fact exist with regard to each of the claims and predominate over questions affecting only individual Class members. Questions common to the Class include, but are not limited to:

(a)    Whether Defendant's use and disclosure of Plaintiffs' and Class members' personally identifiable information and video viewing history was without user consent or authorization;

(b)    Whether Defendant obtained and shared, or caused to be obtained and shared, Plaintiffs' and Class members' personally identifiable information;

(c)    Whether Defendant's disclosures were committed knowingly;

(d)    Whether Defendant disclosed Plaintiffs' and Class members' personal information as a result of Defendant's conduct described herein;

(e)    Whether Defendant's conduct violates the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.*;

(f)    Whether Defendant's acquisition and transmission of Plaintiffs' and Class members' personal information resulted in harm; and

(g)     Whether Defendant should be enjoined from engaging in such conduct in the future.

108.    **Typicality**: Plaintiffs' claims are typical of the claims of Class members in that Plaintiffs, like all Class members, have been injured by BBC's misconduct—disclosing subscribers' personally identifiable information and viewing content to third parties without consent.

109.    **Adequacy of Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions, including privacy protection cases. Plaintiffs do not have any interests antagonistic to those of the Class.

110.    **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class-wide damages are essential to induce BBC to comply with federal and state law. Moreover, because the amount of each individual Class member's claim is small relative to the complexity of the litigation, and because of BBC's financial resources, Class members are unlikely to pursue legal redress individually for the violations detailed in this complaint. A class action will allow these claims to be heard where they would otherwise go unheard because of the expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

111.    **Injunctive relief**: Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole.

## VI.    TOLLING OF THE STATUTES OF LIMITATIONS

112.    The applicable statutes of limitation have been tolled as a result of Defendant's knowing and active concealment and denial of the facts alleged herein.

113.    Defendant secretly incorporated the third parties' SDKs into the Website, providing no indication to users that they were interacting with code that shared their data, including personally identifiable information and video viewing histories, in such a way that the video viewing history could be associated with their individual identity.

114.    Plaintiffs and Class members could not have discovered the full scope of Defendant's conduct at an earlier date by the exercise of due diligence because of the affirmative, deceptive practices and techniques of secrecy employed by Defendant, including, but not limited to: (1) there were no disclosures or other indication that would inform a reasonable consumer that BBC was disclosing, and third parties were receiving and/or intercepting, personally identifiable information and video viewing history from the Website; (2) the manner in which BBC shares users' personally identifiable information and video viewing history from the Website to third parties is highly technical; and (3) deciphering the coding language that transmits users' personally identifiable information and video viewing history from the Website to third parties requires expertise beyond the scope of a reasonable consumer.

115.    Defendant was under a duty to disclose the nature and significance of its data collection practices but did not do so. Defendant is therefore estopped from relying on any statute of limitations under the discovery rule.

116.    Plaintiffs and Class members were not aware that Defendant disclosed and intercepted their data, including personally identifiable information and video viewing history.

117.    Plaintiffs and Class members exercised due diligence to uncover the facts alleged herein and did not have actual or constructive knowledge of Defendant's misconduct by virtue of their fraudulent concealment.

118.    Accordingly, all statutes of limitation are tolled under the doctrine of fraudulent concealment.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT
### 18 U.S.C. § 2710, *et seq.*
### (On Behalf of Plaintiffs and the Class)

119.    Plaintiffs repeat the allegations contained in paragraphs 1 through 118 above, as if fully set forth herein.

120.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally identifiable information" concerning any "consumer" to a third party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

121.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials—including the prerecorded videos that Plaintiffs viewed on the Website—that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

122.    As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiffs and Class members are subscribers to the Website, which provides video content to users. Plaintiffs and Class members are subscribers under the VPPA because they created accounts and provided BBC, at a

minimum, their full names, email address, and/or paid a monthly or annual fee, in order to view prerecorded video content on the Website.

123.    As defined in 18 U.S.C. § 2710(a)(3), "personally identifiable information" includes "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

124.    Defendant knowingly caused Plaintiffs' and Class members' video viewing information to be disclosed to third parties, including to Piano Analytics, along with personally identifying information, including their full name and email address. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member individually to third parties either directly or when combined with personally identifiable information already in their possession, as the individual who viewed Defendant's content, including the specific prerecorded video materials watched on the Website. This information allowed third parties, including at least the identity service providers described above, to identify each Plaintiff's and Class member's specific individual video viewing preferences and habits.

125.    As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendant failed to obtain informed, written consent under this definition.

126.    Defendant was aware that the disclosures to Piano and other third parties that it shared through SDKs it incorporated in the Website, including Piano's SDK, personally identified

Plaintiffs and Class members. Indeed, Piano publicly touts its abilities to identify specific individuals through their identity profiles. Defendant also knew that Plaintiffs' and Class members' video viewing history was directly identifiable because the Website disclosed names and email addresses with video titles to Piano. This personally identifiable information not only identified Plaintiffs and Class members who used those specific apps to Piano Analytics, but it allowed Piano Analytics to identify each Plaintiff's video viewing history by joining the personally identifiable information received from the Website with those received from others. This benefited Piano Analytics by allowing it to build more complete identity profiles on Website users, which in turn were sold to advertisers looking to target these specific individuals with ads. It benefited BBC by allowing it to sell ads to these individuals within its own apps and networks, as well as delivering individualized intelligence about its users' behavior within the Website.

127. By knowingly disclosing Plaintiffs' and Class members' personal viewing content, Defendant violated Plaintiffs' and Class members' statutorily protected right to privacy in their video-watching habits and Plaintiffs and the Class were damaged. *See* 18 U.S.C. § 2710(c).

128. As a result of the above violations, Defendant is liable to Plaintiffs and Class members for actual damages related to their loss of privacy in an amount to be determined at trial or, alternatively, for "actual damages but not less than liquidated damages in an amount of $2,500 per violation." 18 U.S.C. § 2710(c)(2)(A). Under the Act, Defendant is also liable for reasonable attorney's fees, other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury and sufficient to prevent and deter the same or similar conduct by Defendant in the future.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court:

A.      Certify this case as a class action, and appoint Plaintiffs as Class Representatives and the undersigned attorneys as Class Counsel;

B.      Enter judgment in favor of Plaintiffs and the Class;

C.      Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and Class members, including reformation of practices and an accounting and purging of wrongfully obtained personal information;

D.      Award all actual, general, special, incidental, statutory, treble, punitive, liquidated, and consequential damages and/or restitution to which Plaintiffs and Class members are entitled;

E.      Award disgorgement of monies obtained through and as a result of the wrongful conduct alleged herein;

F.      Award Plaintiffs and Class members pre- and post-judgment interest as provided by law;

G.      Enter such other orders as may be necessary to restore to Plaintiffs and Class members any money and property acquired by Defendant through their wrongful conduct;

H.      Award Plaintiffs and Class members reasonable litigation expenses and attorneys' fees as permitted by law; and

I.      Award such other and further relief as the Court deems necessary and appropriate.

## IX.     DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues triable as of right.

Dated: May 1, 2026                          Respectfully submitted,

                                            /s/ Carol C. Villegas
                                            Carol C. Villegas
                                            Michael P. Canty
                                            Danielle Izzo Mazzeo
                                            Gloria J. Medina

32

**LABATON KELLER SUCHAROW LLP**
140 Broadway, 34th Fl.
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
mcanty@labaton.com
dmazzeo@labaton.com
gmedina@labaton.com


Brian Levin *(pro hac vice forthcoming)*
brian@levinlawpa.com
**LEVIN LAW, P.A.**
2665 South Bayshore Drive, PH2B
Miami, Florida 33133
Telephone: 305.539.0593


*Attorneys for Plaintiffs*